# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RANDOLPH W. RENCHARD,

        Plaintiff,

        v.

PRINCE WILLIAM MARINE
SALES, INC., *et al.*

        Defendants.

Civil Action No.  13-698 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

        Pending before the Court in this breach of contract and tort suit are three motions: a Motion to Transfer this Case to the Eastern District of Virginia ("Defs.' Mot. Transfer"), ECF No. 4, filed by all defendants; Defendants Prince William Marina, Inc. ("PWM") and Prince William Marine Sales, Inc.'s ("PWMS") Motion to Dismiss for failure to state a claim ("PWM Defs.' Mot. Dismiss"), ECF No. 5; and Defendant Frank Fiorina's Motion to Dismiss for failure to state a claim ("Def. Fiorina's Mot. Dismiss"), ECF No. 6.  For the reasons set forth below, the Motion to Transfer is denied; Defendant Fiorina's Motion to Dismiss is granted; and Defendants PWM and PWMS' (collectively, the "PWM Defendants") Motion to Dismiss is granted in part and denied in part without prejudice.[1]

---

[1] The defendants have also requested an oral hearing on their motions, pursuant to Local Civil Rule 7(f).  *See* Defs.' Mot. Transfer at 1; PWM Defs.' Mot. Dismiss at 1; Def. Fiorina's Mot. Dismiss at 1.  The Court exercises its discretion provided for under the Rule and denies these requests in light of the briefing provided and in the interest of judicial economy.

# I.     BACKGROUND

The plaintiff, Randolph W. Renchard, is "profoundly and pre-linguistically deaf and uses American Sign Language for daily communication" such that "[t]o communicate with Plaintiff effectively in business or other important situations, a qualified sign interpreter is required."[2] Compl. ¶ 20, ECF No. 1-1.[3]  The plaintiff also "has learning and reading disabilities and cannot write or read unless small words are used."  *Id.* ¶ 19.[4]  In November 2009, the plaintiff purchased a yacht from the PWM Defendants for approximately $1.4 million dollars.  *Id.* ¶ 25.  To facilitate the purchase, on May 19, 2009, the plaintiff had liquidated his living trust and wired $516,481.28 to Defendant PWMS "as a cash deposit toward the purchase of the yacht."  *Id.* ¶ 22; *see* Compl. Ex. 1.  The plaintiff traded in his existing boat, valued at $210,000, and the sale closed in mid-November 2009.  Compl. ¶ 25.  The plaintiff received a mortgage on the boat for the remaining balance, $699,861.74, listing defendant PWMS as the mortgagee dated December 29, 2009.  *Id.* Ex. 5 at 54.  The mortgage states that "[t]o the extent that state law rather than federal law is deemed to apply to any provision of this mortgage, the parties elect to apply the laws of the State of Maryland."  *Id.* at 56.

After obtaining the mortgage, the plaintiff financed "the balance of the purchase by entering into a Retail Installment Contract and Security Agreement [the "First Installment Contract"] with Plaintiff for $692,246.00 on December 30, 2009."  Compl. ¶ 28; *see* Compl. Ex.

---

[2] All facts are taken from the Complaint and assumed to be true for the purposes of a motion to dismiss.  *See, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[3] This case was removed from District of Columbia Superior Court on May 14, 2013.  *See* Notice of Removal at 1, ECF No. 1.  Consequently, the operative Complaint and all exhibits are contained in the file forwarded to this Court with the Notice of Removal.  Paragraph and page numbers for the Complaint and the attached exhibits refer to the page of the Superior Court file, ECF No. 1-1, where the reference can be found.

[4] The PWM Defendants acknowledge the need to make accommodations for the plaintiff in their principal's affidavit filed with their Reply to the Plaintiff's Opposition to the PWM Defendants' Motion to Dismiss, ECF No. 14-1.  Specifically, the PWM Defendants' President, Carlton Phillips, notes that during discussions with the plaintiff, the plaintiff "would insist that I face him so that he could read my lips.  If there was confusion about what was being said my staff and I wrote out notes for him so that he understood."  Aff. of Carlton Phillips, President, PWM & PWMS, ¶ 7, ECF No. 14-1.

3 at 42.  The First Installment Contract required the plaintiff to pay $5,471.35 for thirty-five months, with a final balloon payment of $647,644.25 due at the end of the thirty-sixth month. Compl. Ex. 3 at 42.  The First Installment Contract contains no forum selection clause or choice of law provision.  *See id.* at 42–45.

At all relevant times to this action, the plaintiff contends that the yacht "was slipped in Columbia Island Marina, located in the District of Columbia" and that the District of Columbia "remains [the yacht's] hailing port as of the time of the filing of" the Complaint.[5]  *Id.* ¶¶ 76; 79. Subsequent to the purchase, the plaintiff "made requests for maintenance and repairs to the yacht, via a video relay service, from Columbia Island Marina in Washington, D.C." where the yacht was moored.  Compl. ¶ 33; *see id.* ¶ 23 (discussing transport of yacht to Columbia Island Marina "where [the yacht] would be slipped").  The plaintiff alleges that, to facilitate these maintenance requests, Defendant PWM retained "a set of keys . . . unbeknownst to Plaintiff, to the yacht and the gate securing" the marina.  Compl. ¶ 34.  The cost of these maintenance and repair requests, as claimed by the PWM Defendants, was $25,283.71.  *Id.* ¶ 41.  The plaintiff informed the PWM Defendants that he would be unable to pay for the maintenance in a single lump sum and the parties "orally agreed that Plaintiff would be allowed to pay $500.00 per month towards the maintenance and repair fees, although Plaintiff had questions about some of the fees but could not ask due to communication difficulties."  *Id.* ¶ 42.  The parties did not discuss what law would apply to any disputes as to this oral agreement, or in what forum such disputes would be resolved.  *See id.*  The repairs occurred "on at least fifteen different occasions" in the District of Columbia.  *Id.* ¶ 40.  The $500 payments began in February, 2010, were made

---

[5] The PWM Defendants note that the yacht in question "currently is moored in Virginia."  PWM Defs.' Reply to Pl's Opp'n to PWM Defs.' Mot. Dismiss ("PWM Defs.' MTD Reply") at 7.  This is of no practical import to the resolution of the pending motions, but, in any event, the plaintiff has submitted documents indicating the yacht's hailing port remains Washington, D.C.  *See* Compl. Ex. 17 at 117 (Coast Guard registration showing hailing port as Washington, D.C. at time of filing of suit).

by automatic deduction from the plaintiff's bank account, *id.* ¶ 43, and totaled $9,000 over the ensuing eighteen months, *id.* ¶ 44.

In November, 2010, the PWM Defendants discovered that the boat the plaintiff traded in 2009 still had an outstanding mortgage, on which the plaintiff was continuing to make payments. *See id.* ¶¶ 45–48. The PWM Defendants informed the plaintiff he would need to pay off the mortgage "so that PWM could sell it." *Id.* ¶ 46. The plaintiff averred that he was unable to pay the entire mortgage, but that he was continuing to make payments on it and "that no one at PWM had asked him whether there was a balance owed on the [trade-in boat] or told him that he had to pay it off at the time he purchased the yacht." *Id.* ¶ 47. The trade-in boat's mortgage amounted to just over $26,000 in November 2010. *Id.* ¶ 48. The PWM Defendants apparently paid off the mortgage themselves and "informed Plaintiff . . . that the $26,387.08 paid to [the mortgagee] would be added to the repair and maintenance bills and that Plaintiff should continue making $500.00 monthly payments towards [sic] the entire amount, now approximately $51,000." *Id.* ¶ 49.

During the first half of 2011, the plaintiff "incurred additional fees for purported repairs and maintenance to the yacht totaling $21,039.94." *Id.* ¶ 50. Invoices provided by the plaintiff show that as of August 3, 2011, the plaintiff owed $73,427.93 to Defendant PWMS, separate from the nearly $700,000 owed under the financing arrangement on the boat. *See* Compl. Ex. 9 at 94.

The plaintiff signed another Retail Installment Contract and Security Agreement (the "Second Installment Contract") with Defendant PWMS dated July 15, 2011, at the Defendant PWMS' request. *See* Compl. Ex. 4 at 47–51. Defendant PWMS requested the plaintiff sign this

new contract, without dating it, on February 11, 2010[6] because Defendant PWMS was "changing all of [its] bank contracts to a more professional contract." *Id.* at 47. In the request to the plaintiff, Defendant PWMS noted that, "the [monthly] payment did not change, however, the balloon, final payment is lower than the last contract" since the Second Installment Contract had a slightly longer term than the First Installment Contract. *See id.* This new contract was supposed to end on August 15, 2013, eight months later than the First Installment Contract. *Compare* Second Installment Contract at 48 (listing last payment date as August 15, 2013) *with* First Installment Contract (listing last payment date as December 27, 2012). The Second Installment Contract also applied a lower interest rate than the First Installment Contract. *Compare* Second Installment Contract at 48 (listing interest rate as 6.0 percent) *with* First Installment Contract (listing interest rate as 7.25 percent).

The Second Installment Contract stated, in the section marked "Remedies," that the PWM Defendants "may not accelerate payment or repossess any Property described in this Contract on account of late payment or non-payment of an installment if you make payment (together with any agreed late charge) within 10 days of the date on which the installment was due." Second Installment Contract at 50. Finally, the Second Installment Contract stated that "[t]he law of Virginia will govern this transaction. It is also governed by applicable federal law and regulations. In the event of a dispute, the exclusive forum, venue, and place of jurisdiction will be in Virginia, unless otherwise required by law." *Id.* There is no indication in the Second Installment Contract that the maintenance charges and trade-in mortgage costs incurred since the purchase of the yacht in November, 2009, were included in the amount financed under the

---

[6] The parties do not explain the seventeen month gap between the request and the date on which the Second Installment Contract was signed.

Second Installment Contract. *See id.* at 48 (listing amount financed as $668,000); *compare with* First Installment Contract at 43 (listing amount financed as $692,246.00).

The plaintiff received an email from Defendant PWMS' business manager, Brandy Espinosa, on August 24, 2011, stating that "we need payment for the service work you have had done by next Wednesday (+/- $73,000). If you do not have the balance due you need to turn your yacht in to" the PWM Defendants' owner, Carlton Phillips ("Phillips"). *See* Compl. ¶ 52; *see also* Compl. Ex. 10 at 97. The plaintiff attempted to secure a loan to pay the balance but was unsuccessful. Compl. ¶ 53.

On September 16, 2011, the plaintiff received an e-mail message from a PWM representative noting that Defendant PWM had "picked up the boat and it is now back here (PWM)[;] we will be putting it up for sale." *Id.* ¶ 56; *see also* Compl. Ex. 11 at 99. The plaintiff avers that no lien was filed on the yacht, nor was any attempt made "to otherwise comply with District of Columbia law governing repossession." Compl. ¶ 54–56. Three weeks later, the same PWM representative sent the plaintiff another email notifying him that he would need to "remove [his] personal belongings from the boat" which was being held at the PWM Defendants' place of business. *Id.* ¶ 59; *see also* Compl. Ex. 12 at 101. On October 15, 2011, the plaintiff received a notice by mail from the PWM Defendants stating "[t]his letter is to inform you and confirm verbal discussion about your 2008 Sea Ray 58DB #Y1591. This is formal notice that the boat has been taken for satisfaction of your debt to Prince William Marine Sales and we have put the boat up for sale. Once the boat is sold depending on the actual deal situation, we will work out the possibility of putting you into another smaller boat." Compl. Ex. 13 at 103. The plaintiff avers that he "could not understand what PWM was doing or had done

and continued making payments on the [Second Installment Contract] for the yacht even after PWM had seized it." Compl. ¶ 63.

In April 2012, Defendant PWMS asked the plaintiff to execute a document labelled "Bill of Sale" for the yacht. *Id.* ¶ 64; *see also* Compl. Ex. 15 at 108–09. The plaintiff signed the document on April 20, 2012, although the plaintiff contends that "he thought he was required to do so but did not understand its purpose." Compl. ¶ 65. Two months later, the plaintiff met with Phillips and his secretary, Michelle Price, without a sign language interpreter, and was told that the yacht had been "sold." *Id.* ¶¶ 66–67. During this meeting, the plaintiff was informed that he would be receiving no money back from the "sale" because the yacht had depreciated in value— from $1.4 million to between $700,000 and $800,000—while the plaintiff's debt to Defendant PWMS was "825K." *Id.* ¶¶ 68–70. Notably, the plaintiff alleges that the PWM Defendants told him the boat had been "repossessed," despite the plaintiff having not missed a payment on the Second Installment Contract or on the maintenance fees. *Id.* ¶ 68–69. The plaintiff later learned that the yacht had been part of a "trade" with Defendant Fiorina and, for the purposes of that trade, the yacht had been valued at $1,280,000, not the $700,000-800,000 he had been informed the yacht was worth at the June meeting with the PWM Defendants. *Id.* at 72–74.

The plaintiff filed suit against the defendants in the Superior Court for the District of Columbia on April 17, 2013, stating ten causes of action including common law torts, violation of the District of Columbia Consumer Protection Procedures Act, breach of contract, fraud, and conspiracy. *See* Compl. ¶¶ 81–168. The defendants timely removed the action to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. *See* Not. of Removal at 1. On the date of removal, the defendants filed their motion to transfer this matter to the Eastern District of Virginia pursuant to the forum selection clause in the Second Installment Contract and their

motions to dismiss for failure to state a claim upon which relief can be granted.  *See* Defs.' Mot. Transfer; PWM Defs.' Mot. Dismiss; Def. Fiorina's Mot. Dismiss, *generally*.

In his opposition to Defendant Fiorina's Motion to Dismiss, ("Pl.'s Fiorina Opp'n"), ECF No. 11, the plaintiff withdrew his "cause of action alleging conspiracy against [Defendant] Fiorina."  Pl.'s Fiorina Opp'n at 1.  Consequently, Count Nine, which is one of two claims against Defendant Fiorina, is dismissed as it pertains to him.

In their replies to the plaintiff's Consolidated Memorandum in Opposition to the defendants' Motion to Transfer and the PWM Defendants' Motion to Dismiss ("Pl.'s Opp'n"), ECF No. 12, the defendants raised, for the first time, a procedural challenge to the plaintiff's cause of action for replevin, based on the District of Columbia's statutory requirement that the plaintiff post a bond at the time he initiated the action.  *See* PWM Defs.' Reply Pl.'s Opp'n PWM Defs.' Mot. Dismiss ("PWM Defs.' MTD Reply") at 3, ECF No. 15; Def. Fiorina's Reply Pl.'s Opp'n Def. Fiorina's Mot. Dismiss ("Def. Fiorina's MTD Reply") at 3, ECF No. 16.  In order to provide the plaintiff an opportunity to respond to this new argument, the Court ordered the plaintiff to show cause "why Count 1 of the plaintiff's Complaint should not be dismissed for failure to comply with D.C. Code Section 16-3704" by December 16, 2013.  Minute Order dated December 11, 2013.  The plaintiff did not respond to the Court's Order.

## II.     LEGAL STANDARD

### A.     Motion to Transfer

A case may be transferred to another venue "[f]or the convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  As the Supreme Court has noted, "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and

fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). "[T]ransfer in derogation of properly laid venue" in the District of Columbia "must . . . be justified by particular circumstances that render the transferor forum inappropriate by reference to the considerations specified in" 28 U.S.C. § 1404(a). *Starnes v. McGuire*, 512 F.2d 918, 925 (D.C. Cir. 1974). In deciding a motion to transfer venue under § 1404(a), a court must first determine whether the transferee district is one where the action "might have been brought," 28 U.S.C. § 1404(a), and then must balance the private and public interests involved in the proposed transfer to determine "whether the defendant has demonstrated that considerations of convenience and the interest of justice support a transfer," *Barham v. UBS Fin. Servs.*, 496 F. Supp. 2d 174, 178 (D.D.C. 2007). The burden is on the movant for "establishing that the transfer of this action is proper." *Hooker v. NASA*, No. 12-1358, 2013 WL 4454549, at *1 (D.D.C. Aug. 21, 2013) (internal quotation marks and citation omitted).

**B.      Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6)**

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); FED. R. CIV. P. 8(a). A motion under Rule 12(b)(6) does not test a plaintiff's likelihood of success on the merits; rather, it tests whether a plaintiff properly has stated a claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" to provide

"grounds" of "entitle[ment] to relief." *Twombly,* 550 U.S. at 555 (alteration in original). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 557) (alteration in original). The Supreme Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 556).

## III.    DISCUSSION

At the outset, the plaintiff's failure to respond to the Court's Order to Show Cause regarding his conformance to the District of Columbia statutory requirement that he post a suitable "undertaking" at the time he filed his replevin action, *see* D.C. Code § 16-3704, and the plaintiff's failure to plead or otherwise show in his Complaint that this requirement has been met, compels the Court to dismiss Count 1 of the Complaint. Since Defendant Fiorina is named only in Count 1 and Count 9, which has been voluntarily dismissed, Defendant Fiorina is dismissed from this action.

As to the remaining counts, Counts 2 through 10, the PWM Defendants' motions to dismiss and motion to transfer are interrelated in that the motion to dismiss is, for the most part, premised on the assumption that Virginia law applies to this action. *See* PWM Defs.' Mem. Supp. PWM Defs.' Mot. Dismiss ("PWM MTD Mem.") at 3 ("All of Plaintiff's causes of action are subject to review under the standards required by the law of the Commonwealth of Virginia."), ECF No. 5-2; Pl.'s Opp'n at 10 ("Defendant's [sic] entire motion to dismiss is premised on the erroneous notion that 'the contract attached as Exhibit 4 to the suit upon which

Plaintiff primarily relies requires that all disputes related thereto be subject to the law, jurisdiction and venue of Virginia.'") (quoting PWM Defs.' MTD at 1). Thus, the Court turns first to the defendants' Motion to Transfer.

## A.    The Defendants' Motion to Transfer Venue

The defendants argue that transfer is appropriate for two distinct reasons. First, the defendants contend that the forum selection clause in the Second Installment Contract is binding on this action and, consequently, the Court must transfer this case to the Eastern District of Virginia. *See* Defs.' Mem. Supp. Mot. to Transfer Venue ("Defs.' Transfer Mem.") at 1–2, ECF No. 4-2. Second, the defendants allege that, if the forum selection clause does not apply, the traditional *forum non conviens* factors favor discretionary transfer under 28 U.S.C. § 1404(a). *See id.* at 7–9. Neither argument is persuasive.

### 1.    *The Forum Selection Clause Does Not Apply*

The defendants are correct that "the existence of [a] forum selection clause in the agreement between the parties" is a "major consideration" when analyzing a motion to transfer venue. Defs.' Transfer Mem. at 4. Indeed, the Supreme Court has held that "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause" and "[o]nly under extraordinary circumstances unrelated to the convenience of the parties" may such a motion be denied. *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 581 (2013). While there is no reason to suspect here that the forum selection clause is not "valid," there is also no reason to believe that the forum selection clause applies to the plaintiff's suit.

There were at least six different agreements between the parties according the plaintiff: (1) the original sales contract, which contained no choice of law or venue clause, *see* Compl. Ex.

2; (2) the First Installment Contract, which contained no choice of law or venue clause, *see* First

Installment Contract; (3) the Second Installment Contract, which contained the forum selection

and choice of law clause designating Virginia as the applicable law and forum, *see* Second

Installment Contract; (4) the Bill of Sale and Mortgage, executed on December 29, 2009, which

contained a choice of law provision designating Maryland law but no forum selection clause, *see*

Compl. Ex. 5; (5) the oral agreement for repairs and maintenance payments of $500 per month,

which contained no forum selection or choice of law provision, *see* Compl. ¶¶ 32–42; and (6) the

Bill of Sale executed on April 20, 2012, which contained no forum selection or choice of law

provision, *see* Compl. Ex. 15.  Thus, only one of the six agreements contains the forum selection

clause the defendants now assert is dispositive: the Second Installment Contract.

The forum selection clause at issue is limited to "this transaction," referring to the

transaction outlined in the Second Installment Contract.  *See* Second Installment Contract at 50.

The description of goods or services purchased pursuant to the Second Installment Contract does

not contain any mention of maintenance, repairs, or the balance due on the trade-in mortgage.

*See id.* at 48.  Indeed, the amount financed in the Second Installment Contract is nearly $30,000

less than that financed in the First Installment Contract, despite the fact that the PWM

Defendants showed a $73,000 balance for maintenance services just three weeks after the Second

Installment Contract was signed.  *See id.*; *compare id.* (financing $668,000) *with* First

Installment Contract at 42 (financing $692,246); *see also* Compl. Ex. 9 at 94 (showing balance

due for maintenance and other charges of $73,427.93 on August 3, 2011).  Had the Second

Installment Contract contemplated inclusion of the maintenance and other fees as part of the

"this transaction," presumably the maintenance balance would have been zero, since the money

owed would have been rolled into the financing arrangement.  That was clearly not done.

As pleaded, the plaintiff alleges that the PWM Defendants unlawfully seized the yacht in question not for default on the Second Installment Contract but, rather, for failure timely to pay the charges due for maintenance and repair work and for the outstanding balance on the trade-in mortgage. *See, e.g.*, Compl. ¶¶ 6–8 (alleging that the PWM Defendants "seized Plaintiff's yacht" because "Plaintiff failed to pay the unpaid work orders and trade-in payoff in full"). Although the plaintiff refers to the Second Installment Contract in his Seventh Cause of Action, *see* Compl. ¶¶ 139–48, this reference does not render the maintenance charges, which are the gravamen of this dispute, part of the transaction referenced in the Second Installment Agreement.[7]

The defendants characterize this breach of contract cause of action as "artful dodging," because the plaintiff named Defendant PWMS as the only defendant to which the breach of contact claim applies. *See* Defs.' Reply Pl.'s Opp'n Mot. Transfer ("Defs.' Reply") at 6, ECF No. 14. While it is true that "courts have found that strategic or artfully drawn pleadings will not be permitted to circumvent an otherwise applicable forum selection clause," *Worldwide Network Servs., LLC v. DynCorp Int'l*, 496 F. Supp. 2d 59, 63 (D.D.C. 2007), the pleading here is not such an example. Rather, the facts alleged in the Complaint point to the issues being the oral agreement for maintenance services, the plaintiff's subsequent inability to pay for those services in one, lump-sum payment, and the PWM Defendants' "repossession" of the yacht for those

---

[7] The PWM Defendants read Count 7 as setting out a claim for breach of the Second Installment Contract. *See, e.g.*, PWM Defs.' MTD Mem. at 10–11; PWM Defs.' MTD Reply at 5 ("Plaintiff's Breach of Contract claim unequivocally relies on the Retail Installment Contract and Security Agreement attached to the Complaint."). Count 7, as plead, is not entirely clear as to whether the "contract" alleged to have been breached is the oral agreement between the parties for maintenance services, *see* Compl. ¶¶ 141–42 ("The [Second Installment Contract] provide[s] no provisions for the repair and maintenance of the yacht."), or the Second Installment Contract, *see id.* ¶ 143 ("The sole basis for repossession under the [Second Installment Contract] is default and Plaintiff had never defaulted."). Count 7 also names only Defendant PWMS, the signatory to the Second Installment Contract, which likely compounded the PWM Defendants' understandable confusion. The plaintiff's submissions make clear, however, that Count 7 refers to the oral agreement for maintenance services. *See* Pl.'s Opp'n at 1 ("PWM's repossession was based on repairs that PWM repeatedly performed on the yacht in the District of Columbia, under an agreement not governed by *any* choice of law or forum provision . . . .") (emphasis in original).

unpaid charges.  *See* Compl., *generally*.  Thus, the forum selection clause in the Second

Installment Contract is not, as the defendants assert, "an otherwise applicable forum selection

clause" since it does not apply to this action at all.  The operative agreement is the oral

agreement regarding maintenance to the yacht, not the Second Installment Contract.

The actions giving rise to the instant suit are not part of the "transaction" referenced in

the Second Installment Agreement and, consequently, the forum selection clause in that

document does not apply.  Thus, it is necessary to perform the analysis mandated by 28 U.S.C. §

1404(a), including the weighing of public and private interest factors, to determine whether this

matter should, nevertheless, be transferred to the Eastern District of Virginia.

### 2.  *The § 1404(a) Analysis*

The defendants devote most of their briefing in support of their Motion to Transfer to the

inapplicable forum selection clause in the Second Installment Contract.  *See* Defs.' Transfer

Mem. at 2–4; 5–7; Defs.' Reply at 2–6.  To the extent that the defendants address the relevant §

1404(a) factors, their arguments are unavailing.

The threshold determination required by 28 U.S.C. §1404(a)—that the action "might

have been brought" in the transferee forum—is met: there is no dispute that this action "might

have been brought" in the Eastern District of Virginia.  Indeed, the defendants assert, albeit

erroneously, that it *must* be brought there.  *See* Defs.' Transfer Mem. at 2 ("[T]he choice of law

and forum clause of the contract between the parties *requires* a transfer of this matter to the

Eastern District of Virginia.") (emphasis added); Pl.'s Opp'n *generally* (raising arguments

against transfer but not asserting case could not have been brought in the Eastern District of

Virginia).  At issue, then, is whether the convenience of the parties and the interest of justice, as

encompassed by the various public and private interest factors to be considered with a § 1404(a) motion, support a transfer.

Courts generally look to six private interest factors in evaluating transfer motions: "1) the plaintiff's choice of forum, 2) the defendant's choice of forum, 3) where the claim arose, 4) the convenience of the parties, 5) the convenience of the witnesses, particularly if important witnesses may actually be unavailable to give live trial testimony in one of the districts, and 6) the ease of access to sources of proof." *Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 32–33 (D.D.C. 2008) (citing *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 502 F. Supp. 2d 64, 67 (D.D.C. 2007)).

In most cases, "a plaintiff's choice of forum is . . . a paramount consideration that is entitled to great deference in the transfer inquiry." *FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 26 (D.D.C. 2008) (internal quotation marks omitted). That choice is "entitled to deference, unless that forum has no meaningful relationship to the plaintiff[']s claims or to the parties." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 771 F. Supp. 2d 42, 47 (D.D.C. 2011) (citing *Veney v. Starbucks Corp.*, 559 F. Supp. 2d 79, 84 (D.D.C. 2008)). It is up to the defendants to "carry a weighty burden to demonstrate that the plaintiff[']s forum choice should be disturbed in favor of the . . . defendants' choice." *Id.* This deference is substantially lessened when the plaintiff is a "foreigner" to the forum, *see Thayer/Patricof Educ. Funding, LLC v. Pryor Resources, Inc.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981)), or there is a lack of "meaningful ties" between the controversy, the parties, and the forum, *see Wyandotte Nation v. Salazar*, 825 F. Supp. 2d 261, 268 (D.D.C. 2011). Thus, to some extent, the first factor, the plaintiff's choice of forum, and the third factor, where the claim arose, are often conflated, since the analysis of where the claim

arose necessarily involves examining the ties, or lack thereof, between the parties, the controversy, and the forum.

Here, the plaintiff is not domiciled in the District of Columbia. *See* Compl. ¶ 13 (listing the plaintiff's residence as Maryland). The defendants assert that "[a]ll transactions, dealings, conversations and agreements between the parties are alleged to have occurred in Virginia where the relationship is centered," Defs.' Transfer Mem. at 8, but this statement is belied by the Complaint. All of the repairs around which this dispute centers are alleged to have occurred in the District of Columbia, Compl. ¶¶ 32; 40; the boat was slipped in the District of Columbia, *id.* ¶ 23; the maintenance and repairs were ordered via video conference from the District of Columbia, *id.* ¶ 33, and the alleged improper seizure of the yacht occurred in the District of Columbia, *id.* ¶ 61. Thus, there are plainly significant ties between this forum, the plaintiff, and the events that gave rise to the claim, and consequently, the first and third factors weigh against transfer.

The second factor, the defendants' choice of forum, "is not ordinarily entitled to deference." *Weiner v. Novartis Pharms. Corp.*, No. 07-2108, 2013 WL 6085599, at *2 (D.D.C. Nov. 20, 2013). The defendants offer no argument as to why their choice of forum should be given preference over the plaintiff's, except with regard to the inapplicable forum selection clause. *See* Defs.' Transfer Mem. at 8. Merely stating that the defendants "have consented and pray . . . that the matter be transferred" is insufficient to carry the "heavy burden" of a defendant moving to transfer from an otherwise proper venue. *See Thayer/Patricof*, 196 F. Supp. 2d at 31. Thus, the second factor does not weigh in favor of transfer.

As to the convenience of the parties and access to proof, the defendants make the conclusory statement that "[t]here is no question that the most convenient jurisdiction of the

parties is the Eastern District of Virginia" because all of the defendants are present in that district.  Defs.' Transfer Mem. at 8.  Yet, as the plaintiff points out, the distance between the District of the District of Columbia and Eastern District of Virginia's courthouses is minimal and the two Districts border each other.  *See* Pl.'s Opp'n at 4–5.  In any event, it is axiomatic that "mere inconvenience to the witnesses alone is not enough to warrant transfer," *FC Investment Grp. v. Lichtenstein*, 441 F. Supp. 2d 3, 14 (D.D.C. 2006), and in the instant matter the defendants do not argue that any party will be inconvenienced by litigating this case in the District of Columbia.  Consequently, the fourth, fifth, and sixth factors do not weigh in favor of transfer.  Since the first and third factors weigh in favor of the plaintiff's choice of forum in this District and none of the other factors weigh against the plaintiff's choice of forum, the private interest factors favor resolution of this matter in the District of Columbia.

The public interest factors also favor venue in the District of Columbia.  Courts typically look to three factors in evaluating the public interest: "(1) the transferee forum's familiarity with the governing laws and the pendency of related actions in that forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home."  *Foote v. Chu*, 858 F. Supp. 2d 116, 123 (D.D.C. 2012) (citing *Ravulapalli v. Napolitano*, 773 F. Supp. 2d 41, 56 (D.D.C. 2011)).  The defendants' only argument on this score is that this action "arises entirely out of business dealings that occurred within the Commonwealth of Virginia," which appears to relate to the third factor[8] regarding the interest in "deciding local controversies at home."  Defs.' Transfer Mem. at 8.[9]

---

[8] The first factor, familiarity with governing law, favors venue in this forum since, as explained *infra*, the applicable law is that of the District of Columbia.

[9] The defendants assert in their reply that the yacht is "currently moored in Virginia."  Defs.' Reply at 7.  The defendants offer no reason why this fact matters, particularly in light of the fact that the yacht is no longer in the PWM Defendants' custody after having been sold and the plaintiff's allegation that the yacht was improperly seized and removed to Virginia.  Therefore, the Court affords no weight to this statement.

The maintenance work done that gave rise to the instant suit occurred in the District of Columbia, the yacht itself was slipped in the District of Columbia, and the yacht was allegedly improperly converted in the District of Columbia. *See* Compl. ¶¶ 23; 32; 33; 40. The plaintiff is correct in noting that "the [alleged] unlawful repossession of a . . . vessel from its usual mooring in the District of Columbia for failure to pay for repairs performed in the District of Columbia . . . which were both undertaken with the aid of a key to the marina located in the District of Columbia – on its face suggests the District of Columbia's very strong interest in maintaining this case" in this District. Pl.'s Opp'n at 6. The defendants' cursory and conclusory statement as to the relationship between this action and the Commonwealth of Virginia is belied by the Complaint and, thus, the third public interest factor favors venue in the District of Columbia.

Since the defendants, as the moving party, bear the burden of "showing that a transfer would be appropriate," and the only argument made by the defendants as to the public interest factors is unavailing, the Court finds that the public interest factors as well as the private interest factors are neutral or weigh against transfer. Thus, the defendants' motion to transfer is denied.

**B.      The PWM Defendants' Motion to Dismiss**

The PWM Defendants devote the vast majority of the briefing in support of their motion to dismiss to the applicability of Virginia law. *See* PWM Defs.' MTD Mem.; PWM Defs.' MTD Reply, *generally*. The PWM Defendants argue that, in the absence of the Second Installment Contract's forum selection clause, this Court should still apply Virginia law under the District of Columbia's conflicts of law principles. *See* PWM Defs.' MTD Mem. at 5–7. This argument is unavailing.

This Circuit applies "the law of the forum—in this case, the District of Columbia—to determine whether the law of the District of Columbia . . . reaches this dispute." *Shaw v.*

*Marriott Int'l, Inc.*, 605 F.3d 1039, 1045 (D.C. Cir. 2010). Under District of Columbia choice of law principles, "the Court must first determine whether a 'true conflict' exists between the laws of the competing jurisdictions." *Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91, 100 (D.D.C. 2011). Assuming such a conflict exists, District of Columbia "law will be applied *unless* the foreign state has a greater interest in the controversy." *Jones v. Clinch*, 73 A.3d 80, 82 (D.C. 2013) (quoting *Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985)) (emphasis in original). To determine which jurisdiction has a "greater interest," the District of Columbia uses a modified "governmental interests analysis," which evaluates "the governmental policies underlying the applicable laws and determine[s] which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." *Id.* (quoting *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995)). As part of that analysis, District of Columbia courts examine the four factors set forth in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, namely, "a) the place where the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered." *Id.*

Assuming, *arguendo*, that there is a conflict between the laws of the District of Columbia and the laws of Virginia with regard to the remaining claims in this matter, the Court is convinced that District of Columbia law applies. The injury in question here is the alleged wrongful seizure of the yacht and that injury occurred in the District of Columbia. Furthermore, the conduct causing the injury, which here is the alleged wrongful use of the yacht and marina keys to facilitate the wrongful seizure, also happened in the District of Columbia. Compl. ¶ 61. Thus, the first and second RESTATEMENT factors favor District of Columbia law. The third

factor, the parties' locations, favors either Maryland or Virginia law, because the plaintiff is domiciled in Maryland, *id.* ¶13, while the PWM Defendants are incorporated in Virginia, *id.* ¶¶ 14–15. The fourth factor, the place where the relationship is centered, at best, could favor either District of Columbia or Virginia law, since the yacht was purchased in Virginia but the oral agreement for maintenance services is alleged to have been initiated and consummated in the District of Columbia. *See id.* ¶ 33. In sum, two factors clearly favor the District of Columbia, one appears to favor either the Maryland or Virginia, and the last could favor the District of Columbia or Virginia.

The District of Columbia measures the RESTATEMENT factors qualitatively, and counts the place of injury as particularly significant when an injury is "to [a] tangible thing[]." *Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168, 181–82 (D.C. 2006). Indeed, in *Jones*, the District of Columbia Court of Appeals found the situs of the injury that gave rise to the claim to be "more than sufficient to outweigh" the corporate status of the parties. *Jones*, 73 A.3d at 83. Consequently, District of Columbia law applies to this matter.

Since the PWM Defendants devote the vast majority of their briefing in support of their motion to dismiss to applying Virginia law, *see* PWM Defs.' MTD Mem.; PWM Defs.' MTD Reply, *generally*, which does not apply to this action, and the plaintiff devoted its briefing in opposition to the motion to dismiss to whether Virginia law should apply, *see* Pl.'s Opp'n, *generally*, the parties have failed to put forth an adequate legal foundation on which their claims can be resolved. Consequently, with the exception of the replevin claim, the PWM Defendants' Motion to Dismiss is denied without prejudice to refile, in light of the Court's holding that District of Columbia law applies to this action.

**IV.      CONCLUSION**

For the foregoing reasons, the Defendants' Motion to Transfer is DENIED; Defendant Fiorina's Motion to Dismiss is GRANTED; and the PWM Defendants' Motion to Dismiss is GRANTED as to Count 1 and DENIED without prejudice as to all other claims.  Defendant Fiorina is dismissed from this action.  The parties shall meet and confer pursuant to this Court's Standing Order, ECF No. 8, and jointly submit the required report, including a proposed scheduling order to control further proceedings in this matter, by January 20, 2014.  *See* Standing Order ¶ 3(a).

An appropriate Order accompanies this Memorandum Opinion.

Date: January 6, 2014

_____
BERYL A. HOWELL
United States District Judge